**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

ALAN ROTHSTEIN, individually, and    **:**
on behalf of others similarly situated,    **:**
                                   **:**
       Plaintiff,                **:**     Case No.
                                     **:**
v.                                   **:**
                                   **:**
MICHIGAN FIRST CREDIT UNION,    **:**
                                   **:**
       Defendant.           **:**
                                   **:**

## CLASS ACTION COMPLAINT

Plaintiff Alan Rothstein ("Plaintiff"), by his attorneys, hereby brings this class and representative action against Michigan First Credit Union ("Michigan First" or "Defendant").

## NATURE OF THE ACTION

1.       All allegations herein are based upon information and belief except those allegations which pertain to Plaintiff or his counsel.  Allegations pertaining to Plaintiff or his counsel are based upon, *inter alia*, Plaintiff or his counsel's personal knowledge, as well as Plaintiff or his counsel's own investigation.  Furthermore, each allegation alleged herein either has evidentiary support or is likely to have evidentiary support, after a reasonable opportunity for additional investigation or discovery.

2.       This is a class and representative action brought by Plaintiff to assert claims in his own right, and in his capacity as the class representative of all others persons similarly situated.  Michigan First wrongfully charged Plaintiff and the class members (defined below) overdraft fees.

3.       This class action seeks monetary damages, restitution, and injunctive relief due to Michigan First's policy and practice of assessing an overdraft fee on transactions when there was

enough money in the checking account to cover (pay for) the transactions presented for payment. The charging for such overdraft fees breaches Michigan First's contracts with its customers, who include Plaintiff and the members of the Class.

4.      The charging for such overdraft fees also violates federal law.  Because Michigan First failed to describe its actual overdraft service in its Money Now Service Opt-In Contract by, inter alia, failing to describe accurately in its Money Now Service Opt-In Contract the actual method by which Michigan First calculates its overdraft fees, and because, alternatively, Michigan First did not obtain opt-ins from certain customers whatsoever, Regulation E (12 C.F.R. §§1005.17 *et seq*.) of the Electronic Fund Transfer Act (15 U.S.C.A. §§ 1693 *et seq*.) prohibited Michigan First from assessing overdraft fees for automated teller machine (ATM) and non-recurring debit card transactions (12 C.F.R. §1005.17(b)(1)(i)), but Michigan First did so anyway.

## **PARTIES**

5.      Plaintiff is a resident of Southfield, Michigan, and was a customer of Michigan First at all times relevant to the class action allegations.

6.      Based on information and belief, Defendant Michigan First is a state chartered credit union with headquarters located in Lathrup Village, Michigan.

7.      Whenever reference is made in this Complaint to any act, deed, or conduct of Defendant, the allegation means that Defendant engaged in the act, deed, or conduct by or through one or more of its officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of Defendant's ordinary business and affairs.

8.      As to the conduct alleged herein, each act was authorized, ratified or directed by Defendant's officers, directors, or managing agents.

2

## VENUE AND JURISDICTION

9.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.

10.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) because Defendant is a resident of this District, and pursuant to § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## FACTUAL ALLEGATIONS

**A.      Michigan First's Unlawful Charges of Overdraft Fees**

11.      Michigan First is a credit union with over 17 branches in Michigan and holds approximately $816 million in assets, and reportedly has over 131,000 members.

12.      One of the services offered by Michigan First to consumer banking customers is a checking account.  One of the benefits Michigan First offers with a checking account is a debit card that can be used for a variety of transactions including buying goods and services, as well as the ability to write checks, withdraw from ATM machines, schedule ACH (Automated Clearing House transactions) such as certain recurring payments, and other type of transaction items that debit from the checking account.

13.      In connection with its processing of debit transactions (debit card, ATM, check, ACH, and other similar transactions), Michigan First assesses overdraft fees to customer accounts when it determines that a customer's account has been overdrawn.

14.      Overdraft fees constitute the primary fee generators for banks and credit unions. For example, in 2009, banks and credit unions generated an estimated $37 billion from overdraft fees on debit purchases and ATM transactions.

15.      The high cost of an overdraft fee is usually unfairly punitive.  In a 2012 study, more than 90% of customers who were assessed overdraft fees overdrew their account by

mistake.  (May 2012 Pew Charitable Trust report entitled "Overdraft America:  Confusion and

Concerns about Bank Practices", at p. 4,

http://www.pewtrusts.org/~/media/legacy/uploadedfiles/pcs_assets/2012/sciboverdraft20america

1pdf.pdf).  More than 60% of the transactions that resulted in a large overdraft fee were for less

than $50.  (June 2014 Pew Charitable Trust report entitled "Overdrawn", at p. 8).  More than

50% of those who were assessed overdraft fees do not recall opting into an overdraft program

(*id*. at p. 5), and more than two-thirds of customers would have preferred the financial institution

decline their transaction rather than paying the transaction into overdraft and charging a very

large fee (*id*. at p. 10).

16.     Unfortunately, the customers who are assessed these fees are the most vulnerable

customers.  Younger, lower-income, and non-white account holders are among those who were

more likely to be assessed overdraft fees.  (*Id*. at p. 1).  A 25-year-old is 133% more likely to pay

an overdraft penalty fee than a 65-year-old.  (*Id*. at p. 3).  More than 50% of the customers

assessed overdraft fees earned under $40,000 per year.  (*Id*. at p. 4).  Non-whites are 83% more

likely to pay an overdraft fee than whites.  (*Id*. at p. 3).

17.     As a result of banks and credit unions taking advantage of millions of customers

through the unfair practice of charging overdraft fees through methodologies that maximize the

possible number of expensive overdraft fees to be charged, there has been a substantial amount

of litigation over the past few years. The outcome of these cases has predominantly fallen in

favor of plaintiffs with the banks repaying their customers over one billion dollars for the

unlawfully assessed overdraft fees by way of jury verdicts and settlements.[1]

18.     The federal government has also stepped in to provide additional protections to

---

[1] http://files.consumerfinance.gov/f/documents/CFPB_Arbitration_Agreements_Notice_of_
Proposed_ Rulemaking.pdf , at p. 74-75.

customers with respect to abusive overdraft policies.  In 2010, the Federal Reserve Board enacted regulations giving financial institutions the authority to charge overdraft fees on ATM and one-time debit card transactions only if the institution first obtained the affirmative consent of the customer to do so. (12 C.F.R. § 1005.17 (Regulation E's "Opt-In Rule").)

19.     To qualify as affirmative consent, the Opt-In Contract must include, but is not limited, to the following:

- The customer must be provided the overdraft policy, including the dollar amount of any fees that will be charged for an overdraft and the daily maximum number of fees that may be charged (if there is no maximum, that fact must be stated);

- If the institution offers other means for avoiding overdrafts, such as linking the account to a different account or a line of credit, then it must state that those options exist.

- The opt-in contract must be obtained separately from other contracts and acknowledgements;

- The contract cannot serve any purpose other than opting into the overdraft program;

- The consent cannot be a pre-selected checked box;

- The financial institution may not provide different terms for the account depending on whether the customer opted in to the overdraft program.

If the financial institution does not obtain proper, affirmative consent from the customer that meets all of the requirements of Regulation E's Opt-in Rule, then it is not permitted to charge overdraft fees on ATM and one-time debit card transactions.

20.     At all relevant times, Michigan First has had an overdraft program in place for assessing overdraft fees which is: (1) contrary to the express terms of its contract with customers; (2) contrary to Michigan First's representations about its overdraft program to its customers; and (3) contrary to its customers' expectations regarding the assessment of overdraft fees.

21.     Michigan First entered into a contract with Plaintiff and its other customers referred to herein as the "Money Now" service.  Michigan First was required by Regulation E to provide a contract to Plaintiff and the class members which governs the terms under which Michigan First may assess Plaintiff and the Class members overdraft fees for ATM and non-recurring debit card transactions, and must obtain their affirmative agreement to the contract before being allowed to charge overdraft fees for these debit card and ATM transactions.  On information and belief, the Money Now Service Opt-In Contract states, "An overdraft occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway."  This promise means that Michigan First is not authorized to assess an overdraft fee— because an overdraft has not occurred—unless there is not enough money in the customer's account to cover the transaction.  This contract does not in any way state that there will be deductions made from the money in the customer's account arising from holds placed on pending debit card transactions to create a different artificial balance other than the money in the account on which overdraft fees would be assessed, nor does it state holds placed on moneys in the account arising from deposit holds would lower the amount of money in the account for purposes of allowing an overdraft fee to be assessed.  Furthermore, because the Money Now Service Opt-In Contract does not describe Michigan First's actual overdraft practice, the Opt-In Contract fails to comply with the requirements of Regulation E.  The Money Now Service Opt-In Contract nonetheless contains promises to which Michigan First is contractually bound.

22.     Michigan First entered into a second contract with Plaintiff and its other

6

customers titled "Membership Account Agreement."  The Membership Account Agreement contains a promise that Michigan First will not charge overdraft fees for any type of transaction where there is enough money in the account to pay for the transaction.  The terms of the Membership Account Agreement are reflected in the version of that document dated December 19, 2011.  It stated in a section pertaining to "Withdrawing money from your checking account:" "As long as you have money in your checking account, and subject to any applicable state or federal and (sic) regulations, and the Credit Union's Bylaws, you may withdraw money from your account by a check or any other method approved by the Credit Union."  In another section, entitled: "Overdraft Protection" it states: "The Credit Union is under no obligation (unless it has contracted to the contrary) to pay a check you have written if it would result in this checking account being overdrawn (a check written against your checking account when sufficient available funds are not on deposit in the account and contractual arrangements are not in place to cover it is known as an NSF Check).  These two sections are potentially in contradiction because, *inter alia*, upon information and belief, "money in your account" is the official record of activity in the account; the balance used to determine interest on deposits and any minimum balance requirements; the balance used by Michigan First to report its deposits to regulators, shareholders and the public; the deposit balance provided to regulators in call reports and reserve reports; the balance used in financial reports to shareholders and the balance used for internal financial reporting; and, the balance used by credit reporting agencies in providing credit ratings of Michigan First.  Therefore, "insufficient funds" does not contemplate any sorts of holds on the money in the account.  In contrast, in possible contradiction of this in the other sentence, "sufficient available funds" might or might not mean something else, creating a possible ambiguity in this second contract within its own terms.

  23. But what is undisputable is that nowhere in the Account Agreement in effect

during the class period in this lawsuit does the contract anywhere state that for purposes of an overdraft fee that Michigan First would deduct from the funds in the account holds for pending debit card transactions, or that pending debit card transactions will be subtracted from the balance to create a lower artificial balance different than the real balance for purposes of assessing an overdraft fee. Nowhere does Michigan First state in the Membership Account Agreement before June 2016, which is the Membership Account Agreement pertaining to the class period, that there would be any effect on availability of funds or balance arising from placing holds on pending transactions—the very practice this case confronts. As described below, this only occurred for the first time with the June 2016 Membership Account Agreement, one not applicable to this class period.

24.     Michigan First changed its Membership Account Agreement in June 2016 to purport to change its contract terms as to when it would charge overdraft fees. Specifically, the new account agreement as of June 2016 now expressly stated that it would indeed place holds on pending debit card transactions and thereby reduce the balance available for purposes of assessing when an overdraft would occur, and it specifically defined "available balance" in this manner to account for holds on pending debit card transactions. Not only did no such term exist in the pre-June 2016 contract, but, as stated, there was not even any remote implication that a hold might be placed on pending debit card transactions (which might or might not go through) to reduce the balance in the account to an artificial lower one for purposes of assessing an overdraft fee. In fact, the change in the new June 2016 Membership Account Agreement was so substantial that not only did it insert a definition and explanation of "available balance" into the body of the Membership Account Agreement, but the June 2016 Membership Account Agreement also added new terms to its "Glossary" to address this change in terms, including changing the definition of "Overdraft Item Fee," and adding for the first time new definitions for

8

"Available Balance" and "Current Balance," definitions which did not exist in the pre-June 2016 Membership Account Agreement.  That is why the class period in this case for Class 1 is cut-off on June 1, 2016.

25.     Michigan First's changes and additions to the terms in its June 2016 Membership Account Agreement underscore and reinforce that prior to June 2016, the Membership Account Agreement contract was not in any way to place a hold on pending debit card transactions for determining whether an overdraft fee could be assessed.  Rather, under the Membership Account Agreement, at best for Michigan First there was an ambiguity within the Membership Account Agreement itself whether Michigan First could or could not place a hold on deposits pursuant to the Funds Availability Policy in the Membership Account Agreement contract when determining whether to assess an overdraft fee.  But nowhere is there even an ambiguity on the issue of whether it could place a hold on pending debit card transactions to determine whether an overdraft fee may be assessed; it could not. Only after the June 2016 Membership Account Agreement went into effect was there even a mention or consideration of placing holds on pending debit card transactions and deducting those holds from the funds in the account to determine whether an overdraft fee may be assessed.

26.     In the alternative, Michigan First violated its own Funds Availability Policy during the class period set forth in its Membership Account Agreement (prior to June 2016), because that section clearly identifies the situations under which funds might not be available. Michigan First also promises that it will not assess overdraft fees on ATM and non-recurring debit card transactions against any customer who does not "opt in" to the overdraft service.

27.     Michigan First's contractual promises in its Money Now Service Opt-In Contract and in its Membership Account Agreement contract to only assess overdraft fees when there is not enough money in the account to cover the item, and to only assess such fees for ATM and

9

non-recurring debit transactions against customers who had fully "opted-in" to the overdraft

program, were also provided to customers in other disclosures and marketing materials.

28.     However, directly contrary to these promises, Michigan First's policy and practice

is to ignore whether there is money in the account or a negative balance.  Instead, Michigan

First's policy and practice is, and at all times relevant herein has been, to assess overdraft fees

based on an artificial internal calculation by which it deducts holds it has placed on either

pending debit card transactions or deposits, rather than use the actual money in the account as

required by the Money Now Service Opt-In Contract, or the funds in the account as required by

the Membership Account Agreement without deduction for pending debit card transactions to

determine whether an overdraft has occurred.

29.     The artificial balance created by Michigan First which it used is not the

customer's actual money in the account.  Rather, it is the balance in a customer's account *minus*

anticipated future debits (debits that may or may not occur) and *minus* deposit holds. Not only is

the practice of using this artificial balance method rather than the money in the account to

determine whether a transaction results in an overdraft and thus is subject to an overdraft fee

directly contrary to Michigan First's Money Now Service Opt-In Contract as well as to its

Membership Account Agreement, but such practices have resulted in Michigan First improperly

charging unlawful overdraft fees. Michigan First created this "artificial balance" to increase

overdraft fees it charged its customers.

30.     Michigan First's practice of charging overdraft fees, even when there is enough

money in the account to cover a transaction presented for payment, is inconsistent with how

Michigan First expressly describes the circumstances under which overdraft fees are assessed.

Further, Michigan First has charged its customers, including Plaintiff and the members of the

Class, overdraft fees for ATM and/or non-recurring debit card purchases, without obtaining their

appropriate consent to do so, in violation of Regulation E, and in violation of its contractual promises that it would not charge overdraft fees for ATM and non-recurring debit card purchases without obtaining its customers' separate informed consent, because Michigan First's opt-in method or methods do not include providing its customers the information required to obtain their legally binding informed consent because, *inter alia*, the description in the Money Now Service Opt-In Contract did not describe what Michigan First was actually doing, as required by Regulation E.

31.    The importance of Regulation E is highlighted by the fact that the Consumer Financial Protection Bureau's ("Bureau") study of actual practices found that: 1) ATM and debit card transactions are by far the most frequent transactions that occur; 2) overdraft fee policies entail expensive fees at very little risk to the financial institutions; and 3) opted-in accounts have seven times as many overdrafts that result in fees as not opted-in accounts.[2]

32.    Plaintiff and the Class members have performed all conditions, covenants, and promises required by each of them in accordance with the terms and conditions of the contracts.

33.    Meanwhile, Plaintiff and the Class members could not have anticipated the harm resulting from Defendant's practice throughout the class period.  Money in the account, without deduction for holds on pending transactions or on deposits, as stated, is the official balance of the account.  It is the balance provided to the customer in monthly statements, which is the official record of activity in the account.  It is the balance used to determine interest on deposits and any minimum balance requirements.  Further, based on information and belief, it is the balance used by Michigan First to report its deposits to regulators, shareholders and the public.  It is the deposit balance provided to regulators in call reports and reserve reports.  It is the balance used

_____

[2] http://files.consumerfinance.gov/f/201407_cfpb_report_data-point_overdrafts.pdf

in financial reports to shareholders and the balance used for internal financial reporting. It is the balance used by credit reporting agencies in providing credit ratings of Michigan First.

34.     When Michigan First refers to balance or funds or money in the account, it is reasonable to interpret and understand that as referring to the official balance in the account—which is the balance without deduction for pending debit card transactions or deduction for holds on deposits.  In its study, the Bureau concluded that when a financial institution creates the "overall impression" that it would determine overdraft transactions and fees based on the balance in the account rather than an artificially created balance which has deducted pending transactions, then the "disclosures were misleading or likely to mislead, and because such misimpressions could be material to a reasonable consumer's decision-making and actions, examiners found the practice to be deceptive."  The Bureau further found that "consumers could not reasonably avoid the fees (given the misimpressions created by the disclosures)." (Supervisory Highlights, Winter 2015, at p.9.)

35.     Therefore, Plaintiff, on behalf of himself and all others similarly situated, seeks relief as set forth below.

**B.      Unlawful Overdraft Fees Assessed to Plaintiff**

36.     Plaintiff was harmed by Defendant's policy and practice of charging overdraft fees when there was money in his account to cover the transaction.  Plaintiff entered into agreements with Michigan First wherein Michigan First contracted to charge overdraft fees only if his account did not have money to cover the transaction.  By nonetheless charging Plaintiff overdraft fees when his account did contain enough money to complete the transaction, Michigan First breached its contracts with Plaintiff.  It will be necessary to obtain Defendant's records to determine each instance of such a wrongful overdraft fee.  However, to give one example, on November 13, 2012, Plaintiff had a positive account balance of $588.44 when he made a debit

12

card purchase for $20.00, leaving him a with a positive balance of $568.44.  Despite the fact that

his account contained enough money to complete the transaction, Plaintiff was assessed a

wrongful overdraft fee in the amount of $31.  Plaintiff has a reasonable belief that a complete

review of Plaintiff's and Michigan First's records will show multiple instances in which

Michigan First improperly charged Plaintiff overdraft fees for transactions despite the fact that

Plaintiff had enough money in his account to cover the transactions.

37.     Moreover, the assessment and unilateral taking of improper overdraft fees further

reduces the balance and amount of funds in the account, resulting in and aggressively causing

subsequent, otherwise non-overdraft transactions to be improperly treated as transactions for

which Michigan First assessed further overdraft fees.  This practice was deemed to be deceptive

and substantially harmful to customers by the Consumer Finance Protection Bureau, which made

the following conclusions in its studies:

> Examiners also observed at one or more institutions the following sequence
> of events after the institutions switched balance-calculation methods: a
> financial institution authorized an electronic transaction, which reduced a
> customer's available balance but did not result in an overdraft at the time of
> authorization; settlement of a subsequent unrelated transaction that further
> lowered the customer's available balance and pushed the account into
> overdraft status; and when the original electronic transaction was later
> presented for settlement, because of the intervening transaction and
> overdraft fee, the electronic transaction also posted as an overdraft and an
> additional overdraft fee was charged. Because such fees caused harm to
> consumers, one or more supervised entities were found to have acted
> unfairly when they charged fees in the manner described above. Consumers

likely had no reason to anticipate this practice, which was not appropriately

disclosed. They therefore could not reasonably avoid incurring the overdraft

fees charged. Consistent with the deception findings summarized above,

examiners found that the failure to properly disclose the practice of charging

overdraft fees in these circumstances was deceptive.

(*Infra,* Supervisory Highlights, Winter 2015, a pp. 8-9.)   A complete evaluation of Michigan

First's records is necessary to determine the full extent of Plaintiff's harm from this practice.

38.     Additionally, because the Opt-In Contract did not describe Michigan First's actual

overdraft service, and/or because it contained other deficiencies, Michigan First violated

Regulation E by charging overdraft fees on ATM and non-recurring debit card transactions.

Because it failed to provide the full and accurate disclosures to Plaintiff required by Regulation

E, Michigan First failed to obtain Plaintiff's fully informed consent as required by Regulation E

in order for Michigan First to be authorized to charge such overdraft fees.  Because Michigan

First was not legally authorized to enroll Plaintiff into the program for non-recurring debit card

and ATM transactions, Michigan First violated Regulation E when it assessed any overdraft fees

against Plaintiff for non-recurring debit card and ATM transactions.

39.     Plaintiff was harmed by this practice when he was assessed overdraft fees for

nonrecurring debit card and ATM transactions, such as occurred on March 13, 2012.  A complete

evaluation of Michigan First's records is necessary to determine the full extent of Plaintiff's

harm from this practice as well.

## CLASS ACTION ALLEGATIONS

40.     The preceding allegations are incorporated by reference and re-alleged as if fully

set forth herein.

41.     Plaintiff brings this case, and each of her respective causes of action, as a class

action pursuant to Federal Rule of Civil Procedure 23(a)(b)(1), (b)(2) and (b)(3) on behalf of the following class.

42.     The "Class" is composed of two classes:

**The Account Balance Class:**

> **All United States residents who have or have had accounts with Michigan First who incurred an overdraft fee or overdraft fees when the balance in the checking account was sufficient to cover the transaction or transactions at issue during the period beginning six years preceding the filing of this Complaint and ending on June 1, 2016.**

**The Regulation E Class:**

> **All United States residents who have or have had accounts with Michigan First who incurred an overdraft fee or overdraft fees for ATM or non-recurring debit card transaction(s) during the period beginning on August 15, 2010 and through the present.**

43.     Excluded from the Class is: (1) any entity in which Defendant has a controlling interest; (2) officers or directors of Defendant; (3) this Court and any of its employees assigned to work on the case; and (4) all employees of the law firms representing Plaintiff and the Class members.

44.     This action has been brought and may be properly maintained on behalf of each member of the Class under Federal Rule of Civil Procedure 23.

45.     <u>**Numerosity of the Class (Federal Rule of Civil Procedure 23(a)(1))**</u> – The members of the Class are so numerous that a joinder of all members would be impracticable.

While the exact number of Class members is presently unknown to Plaintiff, and can only be determined through appropriate discovery, Plaintiff believes that the Class is likely to include thousands of members based on the fact that Michigan First has approximately $816 million in assets, operates 17 branches in Michigan and reportedly has over 131,000 members.

46.     Upon information and belief, Defendant has databases, and/or other documentation, of its customers' transactions and account enrollment.  These databases and/or documents can be analyzed by an expert to determine which of Michigan First's customers have been harmed by its practices and thus qualify as Class members.  Further, the Class definitions identify groups of unnamed plaintiffs by describing a set of common characteristics sufficient to allow a member of that group to identify himself or herself as having a right to recover.  Other than by direct notice by mail or email, alternatively proper and sufficient notice of this action may be provided to the Class members through notice published in newspapers or other publications, or in other manners.

47.     **Commonality (Federal Rule of Civil Procedure 23(a)(2)** – This action involves common questions of law and fact.  The questions of law and fact common to both Plaintiff and the Class members include, but are not limited to, the following:

a.     Whether, pursuant to the Opt-In Contract, Defendant promised to Plaintiff and the Class members that it would not charge an overdraft fee if there was enough money in the account to cover the transaction;

b.     Whether, pursuant to the Account Agreement contract, Defendant promised to Plaintiff and the Class members that it would not charge an overdraft fee if there was enough money in the account to cover the transaction;

c.     Whether Defendant breached the Opt-In Contract or Account Agreement Contract by assessing overdraft fees for transactions when customers' checking accounts

16

contained enough money to cover the transactions;

d.      Whether the language in the Opt-In Contract accurately described Defendant's overdraft service pursuant to which Defendant assessed overdraft fees;

e.      Whether Defendant is liable under claims of breach of the covenant of good faith and fair dealing, unjust enrichment and money had and received;

f.      Whether Defendant's conduct violated state consumer protection laws; and

g.      Whether Defendant's conduct violated 12 C.F.R. § 1005.17.

48.     **Typicality (Federal Rule of Civil Procedure 23(a)(3))** – Plaintiff's claims are typical of all of the members of the Class.  The evidence and the legal theories regarding Defendant's alleged wrongful conduct committed against Plaintiff and all of the Class members are substantially the same because all of the relevant agreements between Defendant and its customers, including the Money Now Service Opt-In Contract and Membership Customer Account contract, were identical as to all relevant terms, and also because the challenged practices of charging customers for overdraft fees when there were sufficient funds in the accounts to pay for the transactions at issue, are uniform for Plaintiff and all Class members. Accordingly, in pursuing her own self-interest in litigating her claims, Plaintiff will also serve the interests of the other Class members.

49.     **Adequacy (Federal Rule of Civil Procedure 23(a)(4))** – Plaintiff will fairly and adequately protect the interests of the Class members. Plaintiff has retained competent counsel experienced in class action litigation and overdraft fee issues to ensure such protection.  There are no material conflicts between the claims of the representative Plaintiff and the members of the Class that would make class certification inappropriate.  Plaintiff and his counsel intend to prosecute this action vigorously.

50.    **Predominance and Superiority (Federal Rule of Civil Procedure 23(b)(3))** –

The matter is properly maintained as a class action under Rule 23(b)(3) because the common

questions of law or fact identified herein and to be identified through discovery predominate over

questions that may affect only individual Class members.  Further, the class action is superior to

all other available methods for the fair and efficient adjudication of this matter.  Because the

injuries suffered by the individual Class members are relatively small, the expense and burden of

individual litigation would make it virtually impossible for Plaintiff and Class members to

individually seek redress for Defendant's wrongful conduct.  Even if any individual person or

group(s) of Class members could afford individual litigation, it would be unduly burdensome to

the courts in which the individual litigation would proceed.  The class action device is preferable

to individual litigation because it provides the benefits of unitary adjudication, economies of

scale, and comprehensive adjudication by a single court.  In contrast, the prosecution of separate

actions by individual Class members would create a risk of inconsistent or varying adjudications

with respect to individual Class members that would establish incompatible standards of conduct

for the party (or parties) opposing the Class and would lead to repetitious trials of the numerous

common questions of fact and law.  Plaintiff knows of no difficulty that will be encountered in

the management of this litigation that would preclude its maintenance as a class action.  As a

result, a class action is superior to other available methods for the fair and efficient adjudication

of this controversy.  Absent a class action, Plaintiff and the Class members will continue to

suffer losses, thereby allowing Defendant's violations of law to proceed without remedy and

allowing Defendant to retain the proceeds of their ill-gotten gains.

51.    Plaintiff is not aware of any separate litigation instituted by any of the class

members against Defendant.  Plaintiff does not believe that any other Class members' interest in

individually controlling a separate action is significant, in that Plaintiff has demonstrated above

that her claims are typical of the other Class members and that he will adequately represent the

Class.  This particular forum is a desirable forum for this litigation because both Plaintiff and

Defendant reside in this District, where Defendant operates branch offices, and where its actual

business headquarters are located. Plaintiff does not foresee significant difficulties in managing

the class action in that the major issues in dispute are susceptible to class proof.

52.     Plaintiff anticipates the issuance of notice, setting forth the subject and nature of

the instant action, to the proposed Class members.  Upon information and belief, Defendant's

own business records and/or electronic media can be utilized for the contemplated notices.  To

the extent that any further notices may be required, Plaintiff anticipates the use of additional

media and/or mailings.

53.     This matter is properly maintained as a class action pursuant to Rule 23(b) of the

Federal Rules of Civil Procedure, in that:

    a.   Without class certification and determination of declaratory, injunctive,

       statutory and other legal questions within the Class format, prosecution of

       separate actions by individual members of the Class will create the risk of:

        1.   Inconsistent or varying adjudications with respect to individual

          members of the Class which would establish incompatible

          standards of conduct for the parties opposing the Class; or

        2.   Adjudication with respect to individual members of the Class,

          which would as a practical matter be dispositive of the interests of

          the other members not parties to the adjudication or substantially

          impair or impede their ability to protect their interests. The parties

          opposing the Class have acted or refused to act on grounds

          generally applicable to each member of the Class, thereby making

19

appropriate final injunctive or corresponding declaratory relief with respect to the Class as a whole.

b.  Common questions of law and fact exist as to the members of the Class and predominate over any questions affecting only individual members, and a class action is superior to other available methods of the fair and efficient adjudication of the controversy, including consideration of:

1.  The interests of the members of the Class in individually controlling the prosecution or defense of separate actions;

2.  The extent and nature of any litigation concerning controversy already commenced by or against members of the Class;

3.  The desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

4.  The difficulties likely to be encountered in the management of a class action.

### **FIRST CAUSE OF ACTION**

### **(Breach of The Opt-In Contract)**

54.  The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

55.  Plaintiff and each of the Class members entered into the Money Now Service Opt-In Contract with Defendant covering the subject of overdraft transactions. This contract was drafted by and binding upon Defendant.

56.  In the Money Now Service Opt-In Contract, Defendant promised that Michigan First would assess overdraft fees only when there was not enough money in the account to cover the transaction.

20

57.     Plaintiff and the Class members have performed all conditions, covenants, and promises required by each of them on their part to be performed in accordance with the terms and conditions of the Money Now Service Opt-In Contract, except for those they were prevented from performing or which were waived or excused by Defendant's misconduct.

58.     Defendant breached the express terms of the Money Now Service Opt-In Contract by, *inter alia*, assessing overdraft fees when there was money in the account to cover the transaction or transactions at issue.

59.     As a proximate result of Defendant's breach of the Money Now Service Opt-In Contract, Plaintiff and the Class members have been damaged in an amount to be proven at trial and seek relief as set forth in the Prayer below.

## SECOND CAUSE OF ACTION

### (Breach of the Account Agreement Contract)

60.     The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

61.     Plaintiff and each of the Class members entered into the Membership Account Agreement contract with Defendant covering the subject of overdraft transactions. This contract was drafted by and binding upon Defendant.

62.     In the Account Agreement Contract, Defendant promised that Michigan First would assess overdraft fees when there were "insufficient funds" in the account to cover the transaction.  Nowhere did the Membership Account Agreement contract state it would deduct pending debit card transactions for purposes of determining "sufficient funds" when assessing an overdraft fee.

63.     Plaintiff and the Class members have performed all conditions, covenants, and promises required by each of them on their part to be performed in accordance with the terms

and conditions of the Membership Account Agreement contract, except for those they were prevented from performing or which were waived or excused by Defendant's misconduct.

64.     Defendant breached the express terms of the Membership Account Agreement contract by, *inter alia*, assessing overdraft fees when there were sufficient funds in the account to cover the transaction or transactions at issue.

65.     As a proximate result of Defendant's breach of the Membership Account Agreement contract, Plaintiff and the Class members have been damaged in an amount to be proven at trial and seek relief as set forth in the Prayer below.

### **<u>THIRD CAUSE OF ACTION</u>**

### **(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

66.     The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

67.     Plaintiff and each of the Class members entered into contracts with Defendant covering the subject of overdraft transactions, which have been identified herein as the Money Now Service Opt-In Contract and Membership Account Agreement contract.  These contracts were drafted by and are binding upon Defendant.

68.     In the contracts, Defendant promised that Michigan First would assess overdraft fees only when there was not enough money in the account to cover the transaction.

69.     Further, good faith is an element of every contract pertaining to the assessment of overdraft fees.  Whether by common law or statute, all such contracts impose upon each party a duty of good faith and fair dealing.  Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain.  Thus, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.

Evading the spirit of the bargain and abusing the power to specify terms, constitute examples of bad faith in the performance of contracts.

70.     The material terms of the contract also included the implied covenant of good faith and fair dealing, whereby Defendant covenanted that it would, in good faith and in the exercise of fair dealing, deal with Plaintiff and each Class member fairly and honestly and do nothing to impair, interfere with, hinder, or potentially injure Plaintiff's and the Class members' rights and benefits under the contract.

71.     Plaintiff and the Class members have performed all conditions, covenants, and promises required by each of them on their part to be performed in accordance with the terms and conditions of the contract, except for those they were prevented from performing or which were waived or excused by Defendant's misconduct.

72.     Defendant breached the implied covenant of good faith and fair dealing based on its practices of assessing fees when there was enough money in the account to cover the transaction, failing to provide an accurate description of its overdraft program in its Account Agreement contract, and failing to provide an accurate description of its overdraft program for non-recurring debit and ATM transactions in its Money Now Service Opt-In Contract. In so doing, and in implementing its overdraft program for the purpose of increasing and maximizing overdraft fees, Defendant executed a contractual obligation in bad faith, depriving Plaintiff and the Class members of the full benefit of the contract.

73.     As a proximate result of Defendant's breach of the implied covenant of good faith and fair dealing, Plaintiff and the Class members have been damaged in an amount to be proven at trial and seek relief as set forth in the Prayer below.

### THIRD CAUSE OF ACTION

### (Unjust Enrichment/Restitution)

74.     The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

75.     As a result of the wrongful misconduct alleged above, Defendant unjustly received millions of dollars in overdraft fees.

76.     The Consumer Finance Protection Bureau has concluded that inadequate disclosure of the type of balance-calculation used to determine overdraft transactions and their resultant fees that create additional overdraft fee harm constitutes an Unfair, Deceptive, or Abusive Acts or Practices.  (CFPB Bulletin 2013-07[3], at p. 2 (defining Unfair, Deceptive, or Abusive Acts or Practices based on the FTC balancing test: "1) It causes or is likely to cause substantial injury to consumers; 2) The injury is not reasonably avoidable by consumers; and 3) The injury is not outweighed by countervailing benefits to consumers or to competition"); CFPB Supervisory Highlights, Winter 2015, at p. 9 ("Furthermore, because consumers were substantially injured or likely to be so injured by overdraft fees assessed contrary to the overall net impression created by the disclosures (in a manner not outweighed by countervailing benefits to consumers or competition), and because consumers could not reasonably avoid the fees (given the misimpressions created by the disclosures), the practice of assessing the fees under these circumstances was found to be unfair.").)

77.     Because Plaintiff and the Class members paid the erroneous overdraft fees assessed by Defendant, Plaintiff and the Class members have conferred a benefit on Defendant, albeit undeservingly.  Defendant has knowledge of this benefit, as well as the wrongful

---

[3] http://files.consumerfinance.gov/f/201307_cfpb_bulletin_unfair-deceptive-abusive-practices.pdf

circumstances under which it was conveyed, and yet has voluntarily accepted and retained the benefit conferred.  Should it be allowed to retain such funds, Defendant would be unjustly enriched.  Therefore, Plaintiff and the Class members seek relief as set forth in the Prayer below.

## FOURTH CAUSE OF ACTION

### (Money Had and Received)

78.     The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

79.     Defendant has obtained money from Plaintiff and the Class members by the exercise of undue influence, menace or threat, compulsion or duress, and/or mistake of law and/or fact.

80.     As a result, Defendant has in its possession money which, in equity, belongs to Plaintiff and the Class members, and thus, this money should be refunded to Plaintiff and the Class members.  Therefore, Plaintiff and the Class members seek relief as set forth in the Prayer below.

## FIFTH CAUSE OF ACTION

### (Violation of Electronic Fund Transfers Act (Regulation E)

### C.F.R. § 1005 et seq.  (authority derived from 15 U.S.C. § 1693 et seq.))

81.     The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

82.     By charging overdraft fees on ATM and nonrecurring transactions, Michigan First violated Regulation E (12 C.F.R. §§1005 *et seq*.), whose "primary objective" is "the protection of consumers" (§1005.1(b)) and which "carries out the purposes of the [Electronic Fund Transfer Act (15 U.S.C. §§1693 *et seq*.), the "EFTA"] (§1005.1(b)), whose express "primary objective" is also "the provision of individual consumer rights" (15 U.S.C. §1693(b)).

83.     Specifically, the charges violated what is known as the "Opt In Rule" of Reg E. (12 C.F.R. §1005.17.)  The Opt In Rule states:  "a financial institution ... *shall not assess a fee or charge* ... pursuant to the institution's overdraft service, *unless* the institution:  (i) [p]rovides the consumer with a notice in writing [the opt-in notice]... *describing the institution's overdraft service*"  and (ii) "[p]rovides a reasonable opportunity for the consumer to *affirmatively consent*" to enter into the overdraft program (*Id.*)  The notice "shall be clear and readily understandable." (12 C.F.R. §205.4(a)(1).)  To comply with the affirmative consent requirement, a financial institution must provide a segregated description of its overdraft practices that is accurate, non-misleading and truthful and that conforms to 12 C.F.R. § 1005.17 prior to the opt-in, and must provide its customers a reasonable opportunity to opt-in after receiving the description.  The affirmative consent must be provided in a way mandated by 12 C.F.R. § 1005.17, and the financial institution must provide confirmation of the opt-in in a manner that conforms to 12 C.F.R. § 1005.17.

84.     The intent and purpose of this Opt-In Contract is to "assist customers in understanding <u>how</u> overdraft services provided by their institutions <u>operate</u> .... by <u>explaining</u> the institution's overdraft service ... in a <u>clear and readily understandable way</u>"—as stated in the Official Staff Commentary (74 Fed. Reg. 59033, 59035, 59037, 5940, 5948), which is "the CFPB's official interpretation of its own regulation," "warrants deference from the courts unless 'demonstrably irrational,'" and should therefore be treated as "a definitive interpretation" of Reg E.  *Strubel v. Capital One Bank (USA)*, 2016 U.S. Dist. LEXIS 41487, *11 (S.D. N.Y. 2016) (quoting *Chase Bank USA v. McCoy*, 562 U.S. 195, 211 (2011)) (so holding for the CFPB's Official Staff Commentary for the Truth In Lending Act's Reg Z)).

85.     Michigan First failed to comply with Regulation E, 12 C.F.R. § 1005.17, which requires affirmative consent before a financial institution is permitted to assess overdraft fees

against customers' accounts through an overdraft program for ATM and non-recurring debit card transactions. Michigan First has failed to comply with the 12 C.F.R. § 1005.17 opt-in requirements, including failing to provide its customers with a valid description of the overdraft program which meets the strictures of 12 C.F.R. § 1005.17.  Michigan First's opt-in method fails to satisfy 12 C.F.R. §1005.17 because, *inter alia*, it states that an overdraft occurs when there is not enough money in the account to cover a transaction but Michigan First pays it anyway, when in fact Michigan First assesses overdraft fees when there is enough money in the account to pay for the transaction at issue.

86.     As a result of violating Regulation E's prohibition against assessing overdraft fees on ATM and non-recurring debit card transactions without obtaining affirmative consent to do so Michigan First has harmed Plaintiff and the Class.

87.     Due to PUB's violation of Regulation E (12 C.F.R. § 1005.17), Plaintiff and members of the Class are entitled to actual and statutory damages, as well as attorneys' fees and costs of suit pursuant to 15 U.S.C.A. § 1693m.

## SIXTH CAUSE OF ACTION

**(For Violation of the Connecticut Unfair Trade Practices Act, Connecticut Code § 42-110(a), et seq.)**

88.     The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

89.     By the actions alleged above, Defendant has engaged in unfair and/or deceptive acts or practices against Plaintiff and the Class members in violation of the Connecticut Unfair Trade Practices Act.  The practices were deceptive because, *inter alia*, Defendant promised Plaintiff and the Class members in its contracts and in other representations, including marketing materials, that it would only assess fees for overdrafts where the transaction at issue exceeded the

27

amount of money in the customer's account.  Those promises were intended to induce Plaintiff to

engage in an obligation, signing up for an account with Defendant, and/or entry into Defendant's

overdraft program, and they were untrue.  Instead, Defendant assessed fees based on a limited

portion of the customer's account because it would create an artificial balance by deducting

holds it had placed on the money in account for pending transactions or for deposits, despite

there at all times being enough money actually in the account to cover the transaction.

Defendant also engaged in an unfair and/or deceptive act or practice when it charged overdraft

fees for ATM and non-recurring debit card transactions despite its contractual and legal

obligations not to do so when there was enough money in the account to cover the transaction.

Plaintiffs suffered when they were assessed wrongful overdraft fees.

90.    Plaintiff and the Class suffered ascertainable harm, and are thus entitled to

damages and other relief in a form and amount to be determined by a court of law.

## PRAYER

WHEREFORE, Plaintiff and the Class pray for judgment as follows:

1.  For an order certifying this action as a class action;

2.  For compensatory damages on all applicable claims and in an amount to be

proven at trial;

3.  For an order requiring Defendant to disgorge, restore, and return all monies

wrongfully obtained together with interest calculated at the maximum legal rate;

4.  For an order enjoining the wrongful conduct alleged herein;

5.  For costs;

6.  For pre-judgment and post-judgment interest as provided by law;

7.  For attorneys' fees under the Electronic Fund Transfer Act, the common fund

doctrine, and all other applicable law; and

8.  For such other relief as the Court deems just and proper.

### DEMAND FOR JURY TRIAL

Plaintiff and the Class members demand a trial by jury on all issues so triable.

ALAN ROTHSTEIN, individually, and on behalf of others

similarly situated,

MICHAEL B. SERLING, P.C.

By:      /s/ *Philip J. Goodman*
Philip J. Goodman (P14168)
pjgoodman1@aol.com
Of Counsel
280 N. Old Woodward Avenue, Suite 406
Birmingham, Michigan  48009
Telephone:  (248) 647-9300
Facsimile:  (248) 647-8481

Richard D. McCune, California Bar No. 132124*
rdm@mccunewright.com
Jae (Eddie) K. Kim, California Bar No. 236805*
jkk@mccunewright.com
**McCUNE WRIGHT AREVALO LLP**
3281 East Guasti Road, Suite 100
Ontario, California 91761
Telephone:  (909) 557-1250
Facsimile:  (909) 557-1275

Taras Kick, California Bar No. 143379*
Taras@kicklawfirm.com
Robert Dart, California Bar No. 264060*
Robert@kicklawfirm.com
**THE KICK LAW FIRM, APC**
201 Wilshire Boulevard
Santa Monica, California 90401
Telephone:   (310) 395-2988
Facsimile:   (310) 395-2088

Attorneys for Plaintiff Alan Rothstein
and the Putative Class

*Pro Hac Vice* Petitions to be submitted